REVISED OCTOBER 5, 2001

UNITED STATES COURT OF APPEALS
For the Fifth Circuit

No. 00-30171

AUDREY T. CELESTINE, WILTON GUILLORY; ANGEL ANN
LEBLANC; EDWINA M. HARRIS; PATRICIA A. PITRE; ET AL.,

Plaintiffs-Appellants,

and

HILLERY RANDELL; JONATHAN ANDERSON,

Movants-Appellants,

and

LEO REEDER; RUSSELL METOYER; DANIEL L. COX, SR.,

Intervenors-Plaintiffs-Appellants,

VERSUS

PETROLEOS DE VENEZUELLA SA; ET AL.,

Defendants,

CITGO PETROLEUM CORP.,

Defendant-Appellee.

Appeal from the United States District Court
For the Western District of Louisiana

September 18, 2001

Before JONES, DeMOSS, and BENAVIDES, Circuit Judges.

DeMOSS, Circuit Judge:

This case concerns allegations of workplace racism directed at African Americans at the CITGO Petroleum Corporation's ("CITGO") Lake Charles, Louisiana plant. After the district court denied class certification, the appellants proceeded forward with the action as a series of individual claims. The district court subsequently granted summary motion in favor of the defendant CITGO on these claims. Plaintiffs now appeal from this grant by the district court.

## BACKGROUND

On May 21, 1993, two hundred and six plaintiffs filed suit against CITGO alleging that a pattern and practice of racial discrimination existed in CITGO's hiring, promotions and training at its Lake Charles plant. These plaintiffs also brought Title VII hostile work environment claims. In September 1993, the plaintiffs filed a motion for the certification of a class estimated to contain more than 1,000 potential members. All of the members of the proposed class were either African American employees, both current and former, or unsuccessful applicants for employment at CITGO's sprawling Lake Charles complex. The district court referred the case to a magistrate judge for consideration of the class certification issue.

Following a hearing, the magistrate judge informed the parties that he was considering recommending to the district court a *sua sponte* grant of summary judgment to CITGO on the "hostile work environment" claims, and invited the plaintiffs to submit summary judgment evidence supporting their position. In total, forty-four plaintiffs came forward with evidence indicating the existence of a hostile work environment. The magistrate examined the summary judgment evidence offered by each of these forty-four individual plaintiffs and concluded that no reasonable trier of fact could find that the plaintiffs had established that there was intentional, pervasive, and regular racial discrimination of which CITGO's supervisors and management were aware and which CITGO permitted to continue. The magistrate judge therefore recommended that summary judgment be granted to CITGO on all forty-four of these hostile work environment claims. On July 12, 1996, the district court accepted the magistrate judge's recommendation and granted summary judgment to CITGO on these claims.

During this same period, the magistrate judge recommended the denial of class certification on the Title VII racial discrimination for failure to hire, promote and train claims. The district court again accepted the magistrate judge's report, and denied class certification. The plaintiffs filed an interlocutory appeal to this Court, which affirmed the district court's denial of class certification. *Allison v. CITGO Petroleum Corp.*, 151 F.3d

3

402, 426 (5th Cir. 1998). On October 2, 1998, this Court denied the appellants' motion for rehearing *en banc* on the class certification issue.

With class certification denied, this case proceeded forward as a series of individual claims. The claims of the three plaintiffs who worked in the refinery lab were consolidated, pursuant to Federal Rule of Civil Procedure 42(a). The refinery lab discrimination case was tried to a jury on October 18-20, 1999, and the jury returned a verdict in favor of defendant CITGO.

A second group of thirty-six failure to promote and train racial discrimination claims was also consolidated, with this group containing the claims of the refinery maintenance workers. CITGO filed a motion for partial summary judgment on the issue of temporal scope, asserting that the continuing violation doctrine, a device which would allow incidents of racial discrimination from outside the relevant time period to be considered, did not apply. On January 3, 2000, the appellants filed their opposition to this motion.

CITGO filed a second motion for summary judgment on December 28, 1999, this time seeking outright summary judgment on each of the thirty-six refinery maintenance workers' failure to promote and train claims. On January 11, 2000, the district court granted both of CITGO's motions for summary judgment, ruling that the continuing violation doctrine was inapplicable and granting summary judgment

4

on each of the failure to promote and hire discrimination claims.

These African American CITGO employee plaintiffs now appeal both the July 1996 grant of summary judgment on their hostile work environment claims and the January 2000 grant of summary judgment on their failure to promote and train claims. The October 1999 jury verdict in the refinery lab failure to promote and train case is not appealed.

DISCUSSION

## Standard of review

A grant of summary judgment is reviewed *de novo*. ***Hanks v. Transcon. Gas Pipe Line Corp.***, 953 F.2d 996, 997 (5th Cir. 1992). The party seeking summary judgment carries the burden of demonstrating that there is an absence of evidence to support the nonmoving party's case. ***Celotex v. Catrett***, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554 (1986). After a proper motion for summary judgment has been made, a nonmovant must bring forward sufficient evidence to demonstrate that a genuine issue of material fact exists for every element of a claim. ***Fontenot v. Upjohn Co.***, 780 F.2d 1190, 1196 (5th Cir. 1986). For summary judgment purposes, all evidence produced by the nonmovant is taken as true and all inferences are drawn in the nonmovant's favor. ***Adickes v. S.H. Kress & Co.***, 398 U.S. 144, 158-59, 90 S.Ct. 1578, 1609-10 (1970); ***Pitts v. Shell Oil Co.***, 463 F.2d 331, 335 (5th Cir. 1972). This Court reviews the evidentiary rulings of the district court "only

5

for abuse of discretion." ***EEOC v. Manville Sales Corp.***, 27 F.3d 1089, 1092-93 (5th Cir. 1994).

## The granting of summary judgment for CITGO under Federal Rule of Civil Procedure 56(c)

Appellants object to the district court's January 11, 2000, grant of summary judgment on the failure to promote and train claims because they were not allotted the full ten days provided by Fed.R.Civ.P. 56(c) to respond to CITGO's motion for summary judgment.

CITGO filed a motion for summary judgment on December 28, 1999, seeking summary judgment on each of the thirty-six refinery maintenance workers' failure to promote and train claims. On December 29, 1999, the district court advised the appellants that their response to CITGO's motion for summary judgment was due within 15 days after service, and that due to the fast-encroaching trial scheduled for February 28, 2000, no extensions would be given. On January 11, 2000, appellants counsel filed a motion for an extension of time to respond to CITGO's motion for summary judgment seeking to extend the deadline until January 31, 2000.

The district court immediately responded by issuing an order denying the request for an extension of time to respond. That same day, January 11, the district court granted CITGO's motion for summary judgment on the failure to promote and train claims.

As computed under Fed.R.Civ.P. 6(a),[1] there were not the requisite ten days provided by Fed.R.Civ.P. 56(c) between the filing of the motion for summary judgment on December 28, 1999, and the district court's grant of summary judgment on January 11, 2000. For this reason, the appellants urge that the January 11, 2000, grant of summary judgment be reversed.

This court has repeatedly explained that strict enforcement of the ten day notice requirement of Rule 56(c) is necessary because summary judgment is a final adjudication on the merits. *See, e.g., Powell v. United States*, 849 F.2d 1576, 1579 (5th Cir. 1988); *Underwood v. Hunter*, 604 F.2d 367, 369 (5th Cir. 1979). This Court has reasoned that because "a summary judgment forecloses any future litigation of a case, the district court must give proper notice to insure that the nonmoving party had the opportunity to make every possible factual and legal argument." *Powell*, 849 F.2d at 1579.

However, it is also possible for the district court's denial of this ten day period to be harmless error: "It appears clear that error in notice is harmless if the nonmoving party admits that he has no additional evidence anyway or if . . . the appellate court evaluates all of the nonmoving party's additional evidence and finds no genuine issue of material fact." *Powell*, 849 F.2d at

---

[1] Rule 6(a) reads in relevant part that "[w]hen the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation."

7

1581. The appellants do not point to any new evidence which they would have included in their response to CITGO's motion for summary judgment had they been allowed to respond on January 12 or 14, 2000, as they urge. In the absence of any new evidence which would have been presented to the district court if appellants had been allowed a full ten days to respond, the district court's error was harmless.

**The temporal scope of this action, for both the hostile work environment and racial discrimination claims**

The district court concluded that the relevant time period for this lawsuit was April 29, 1992, to May 24, 1994. This time frame applied to both the appellants' hostile work environment and failure to promote and train claims. Having defined the temporal scope of the lawsuit, the district court refused to look at incidents falling outside this period.

The method utilized by the district court in calculating this time period was clear and correct. As noted by the district court, the first EEOC charges lodged in this case were filed by Charlet McCain on October 26, 1992. A Title VII plaintiff must file a charge of discrimination with the EEOC no more than 180 days after the alleged discriminatory employment occurred. 42 U.S.C. § 2000e-5(e)(1). In "deferral states" this filing period is extended to 300 days if there is also a discrimination claim based on state law. However, it is undisputed that at the time the initial EEOC charges were filed in this case Louisiana was not a deferral state,

and therefore the 180 filing period, rather than the 300 day period, applied.  The district court was thus right to look at April 29, 1992, the date 180 days prior to the filing of the first Title VII claim, as the earliest date on which an incident of discrimination could be considered in this case.

Similarly, the "closing date" for this action of May 24, 1994, was also arrived at by looking at the dates on which EEOC charges were filed.  May 24, 1994, was the date on which the last EEOC claim was filed against CITGO's Lake Charles facility.  The appellants did not attempt to amend their complaint or supplement their responses to interrogatories to include evidence of discriminatory acts occurring after this date.  Therefore, the district court was acting within its discretion when it decided to exclude all evidence of discriminatory acts occurring after May 24, 1994.  *Scott v. Univ. of Miss.*, 148 F.3d 493, 513 (5th Cir. 1998), *overruled on other grounds*, *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 120 S.Ct. 631 (2000) (excluding evidence of post-charge discrimination which was not included in an amended complaint); *Info. Res. Inc. v. United States*, 996 F.2d 780, 785 (5th Cir. 1993) (holding that the district court did not abuse its discretion in excluding a post-charge claim where the plaintiff delayed supplementing discovery responses to include the claim until shortly before trial).  Thus, only incidents occurring between April 29, 1992, and May 24, 1994, need be considered in this

multiple plaintiff, non-class action lawsuit. *Cf*. ***Crawford v. United States Steel Corp.***, 660 F.2d 663, 665 (5th Cir. 1981) (holding that if one plaintiff has filed an EEOC charge, then co-plaintiffs with individual claims arising out of similar discriminatory treatment in the same time frame need not have satisfied the filing requirement to join the Title VII suit).

Despite the limited temporal scope established by the district court, the appellants have attempted to introduce acts of alleged discrimination dating from the mid-1970s to the mid-1990s. The appellants attempt to introduce these long-past incidents under the "continuing violation" doctrine, which has been endorsed for use by this court under limited circumstances. The continuing violation theory relieves a plaintiff of establishing that all of the complained-of conduct occurred within the actionable period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period. ***Messer v. Meno***, 130 F.3d 130, 135 (5th Cir. 1997). The continuing violation doctrine is designed to "accommodate plaintiffs who can show that there has been a pattern or policy of discrimination continuing from outside the limitations period into the statutory limitations period, so that all discriminatory acts committed as part of this pattern or policy can be considered timely." ***Hardin v. S.C. Johnson & Son, Inc.***, 167 F.3d 340, 344 (7th Cir. 1999).

Although there is no definitive standard for what constitutes

a continuing violation, the plaintiff seeking to invoke this doctrine must demonstrate more than a series of discrete discriminatory acts: "He must show an organized scheme leading to and including a present violation, such that it is the cumulative effect of the discriminatory practice, rather than any discrete occurrence, that gives rise to the cause of action." *Huckabay v. Moore*, 142 F.3d 233, 239 (5th Cir. 1998) (citations omitted). This court has identified at least three factors that may be considered in determining if a continuing violation exists: (1) Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? (2) Are the alleged acts recurring or more in the nature of an isolated work assignment or incident? (3) Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights? *Huckabay*, 142 F.3d at 239.

Appellants seek to apply the continuing violation theory to both their hostile work environment and failure to promote and train claims. This would allow the appellants to introduce evidence of approximately 80 incidents of alleged racial discrimination that occurred prior to the time period designated by the district court for this lawsuit.

The district court was entirely correct in refusing to apply the continuing violation theory to the appellants' racial discrimination for failure to promote and train claims. This

11

court's decision in *Huckabay* makes clear that a one-time employment event, including the failure to hire, promote, or train and dismals or demotions, is "the sort of discrete and salient event that should put the employee on notice that a cause of action has accrued." *Huckabay*, 142 F.3d at 240. These "discrete adverse actions, although racially motivated, cannot be lumped together with the day-to-day pattern of racial harassment" and therefore, if otherwise untimely, cannot be saved by the continuing violation doctrine. *Id.* An employee who claims to be the victim of a racially motivated failure to promote or train is put on notice that his rights have been violated at the time the adverse employment decision occurs, and must therefore bring the claim within 180 days of the adverse decision.

The appellants' hostile work environment claims are potentially more compatible with the continuing violation doctrine. However, the continuing violation doctrine does not automatically attach in hostile work environment cases, and the burden remains on the employee to demonstrate an organized scheme led to and included the present violation. *Huckabay*, 142 F.3d at 239; *Berry v. Bd. of Supervisors*, 715 F.2d 971, 981 (5th Cir. 1983). In addition, "the continuing violation theory requires the same type of discriminatory acts to occur both inside and outside the limitations period," such that a valid connection exists between them. *Martineau v. ARCO Chem. Co.*, 203 F.3d 904, 913 (5th Cir.

12

2000).  Finally, "where a pattern of harassment spreads out over years, and it is evident long before the plaintiff sues that she was a victim of actionable harassment, she can not reach back and base her suit on conduct that occurred outside the statute of limitations."  *Hardin*, 167 F.3d at 344; *see also* *Webb v. Cardiothorasic Surgery Assocs.*, 139 F.3d 532, 537 (5th Cir. 1998) (explaining that, under the continuing violation doctrine, the plaintiff still must show a series of acts, one or more of which fall within the limitations period).

Given these various restrictions on use of the continuing violation doctrine, the burden is upon each of the appellants[2] to offer evidence that they suffered race-base harassment both prior and during the filing period, that the incidents of harassment were related, and that the harassment was pursuant to an organized scheme.  *Huckabay*, 142 F.3d at 238; *Berry*, 715 F.2d at 981.  The appellants fail to carry this burden for each of their claims.  The appellants neglect the fact that they are before this Court as individual plaintiffs rather than as members of a class.  Rather than describing each individual appellant's hostile work environment and explaining why application of the continuing violation doctrine would be appropriate for each appellant's claim, the appellants paint with wide brush strokes, making broad

---

[2]      Contrary to the appellants' assertions, the burden is upon them to establish that the continuing violation doctrine applies.  *Webb*, 139 F.3d at 537.

13

generalizations about the working conditions at CITGO over the last three decades.  The appellants apparently want the continuing violation doctrine applied on a (non-existent) class-wide basis, rather than on a claim-by-claim basis.  In no instance do the appellants take an individual hostile work environment claim and cite examples of racial harassment during the 180 day period, correlate this to similar racial incidents prior to the filing period, and identify a organized scheme underlying this harassment. It is apparent from the district court's grant of summary judgment and the appellee's brief that many of the appellants fail to identify any acts of alleged racial harassment at all during the limitations period.  No appellant claims to have been the victim of severe and pervasive harassment during the limitations period, and no appellant identifies any organized scheme underlying the alleged harassment.

Because the appellants have failed to carry their burden in attempting to invoke the continuing violation doctrine, the district court did not err in refusing to consider alleged acts of harassment that occurred prior to April 29, 1992.

**Appellants' hostile work environment claims**

Appellants argue that they each established a prima facie case of a hostile work environment.  A prima facie case of racial harassment alleging hostile work environment normally consists of five elements: (1) the employee belongs to a protected group; (2)

14

the employee was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term condition or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Watts v. Kroger Co.*, 170 F.3d 505, 509-10 (5th Cir. 1999); *Jones v. Flagship Int'l*, 793 F.2d 714, 719-720 (5th Cir. 1986). For harassment to affect a "term, condition, or privilege of employment" it must be "sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment." *Watts*, 170 F.3d at 509.

However, this well-established five-part test has recently undergone a revision, with the Supreme Court ruling that in Title VII harassment cases, where the harassment is allegedly committed by a supervisor with immediate (or successively higher) authority over the harassment victim, the plaintiff employee needs to satisfy only the first four of the elements listed above. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 2292-93 (1998). Once the plaintiff makes the four-part showing that they have been harassed by a supervisor, the "employer is subject to vicarious liability to a victimized employee" for the supervisor's conduct.[3]

---

[3] An affirmative defense is available to employers in certain circumstances under *Faragher*, provided that the supervisor's harassment did not culminate with any "tangible employment action" against the employee. *Faragher*, 524 U.S. at 807.

15

*Id.*

The magistrate judge and the district court reviewed the hostile work environment claims of forty-four individual appellants and concluded that no reasonable fact finder could find that the appellants had established that there was intentional, pervasive, and regular racial discrimination of which CITGO's supervisors and management were aware and which CITGO permitted to continue. The magistrate reviewed the individual hostile work environment claims in detail, concluding that all of them failed to make out a prima facie case because the alleged incidents took place outside of the limitations period, the complained of incidents were not severe or pervasive enough to constitute actionable racial harassment, or that CITGO was not aware of the harassment.

The appellants correctly point out that the district court's 1996 grant of summary judgment to CITGO on this set of hostile work environment claims predates *Faragher*. While the district court correctly applied the law as it stood at the time, it did not anticipate *Faragher*. The district court did not take into account that CITGO could be held vicariously liable for racial harassment by its supervisors, even if it was not aware of this racial harassment. However, a review of the record excerpts and briefs reveals only eight incidents of alleged racial harassment involving supervisory personnel during the relevant time period (between April 29, 1992, and May 24, 1994). Of these instances involving

16

supervisory personnel, none can be said to be "sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment." *Watts*, 170 F.3d at 509.

Aside from challenging the relevant time period defined by the district court and invoking the new rule of *Faragher*, the appellants offer no reason why the district court erred in finding that the hostile work environment plaintiffs had failed to make out their respective prima facie cases.

**Appellants' Title VII failure to promote and train claims**

On January 11, 2000, the district court granted summary judgment for CITGO and against 37 individual appellants claiming that they were discriminated against by being denied promotions and training because of their race in violation of Title VII. 42 U.S.C. §§ 2000e-2000e(17). Claiming that the district court applied an erroneous legal standard by "pigeonholing" the plaintiffs into the familiar burden-shifting framework of *McDonnell-Douglas* and by forcing them to prove "better qualifications" as part of their prima facie case, these plaintiffs now appeal.

In order to overcome a motion for summary judgment on a Title VII discrimination claim, the plaintiff must first establish, by a preponderance of the evidence, a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-26 (1973); *Haynes v. Penzoil*, 207 F.3d

17

296, 300 (5th Cir. 2000); *Shackelford v. Deloitte & Touche*, 190 F.3d 398, 404 (5th Cir. 1999). A prima facie case of discrimination in a failure to promote or train case consists of four elements: (1) the employee is a member of the protected class; (2) he sought and was qualified for the position; (3) he was rejected for the position; (4) the employer continued to seek applicants with the plaintiff's qualifications. *Haynes*, 207 F.3d at 300. The prima facie case, once established, raises an inference of intentional discrimination, and the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If the defendant satisfies this burden, the plaintiff must prove that the proffered reasons are pretextual. *Id.* Once a Title VII claim reaches this pretext stage, "the only question on summary judgment is whether there is a conflict in substantial evidence to create a jury question regarding discrimination." *Id.*

A. **The "pattern and practice" method of proof**

The district court properly invoked and applied this *McDonnell Douglas* burden-shifting scheme in analyzing the appellants' claims on summary judgment. Appellants, however, object to the application of *McDonnell Douglas*, arguing instead that the "pattern and practice" mode of proof for racial discrimination claims recognized in *Teamsters v. United States*, 431 U.S. 324, 358-59, 97 S.Ct. 1843, 1866-67 (1977), should have been applied to their

18

claims.  A pattern or practice case is not a separate and free-standing cause of action (as the appellants assert), but is really "merely another method by which disparate treatment can be shown." *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1219 (5th Cir. 1995). The typical pattern or practice discrimination case is brought either by the government or as a class action to establish "that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers." *Teamsters*, 431 U.S. at 360.

The pattern and practice method of proof is almost exclusively used in class actions, with individual racial discrimination plaintiffs confined to the *McDonnell Douglas* framework. *Scarlett v. Seaboard Coast Line R.R. Co.*, 676 F.2d 1043, 1053 (5th Cir. 1982) ("This is not a 'pattern and practice suit' by the government . . . [n]or is this a private class action . . . [a]n individual proceeding as an individual under Title VII must prove the elements of a discriminatory hiring claim as set forth in *McDonnell Douglas*."). The Supreme Court has never applied the *Teamsters* method of proof in a private, non-class suit and has recognized the distinction between individual racial discrimination claims and class actions:

> The crucial difference between an individual's claim of discrimination and a class action alleging a general pattern or practice of discrimination is manifest.  The inquiry regarding an individual's claim is the reason for a particular employment decision, while at the liability stage of a

> pattern-or-practice trial the focus often will not
> be on individual hiring decisions, but on a pattern
> of discriminatory decisionmaking.

*Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 876, 104

S.Ct. 2794, 2799-2800 (1984).

While the Supreme Court has not explicitly stated that the

pattern and practice method of proof may never be used in private

non-class suits, other courts have reached this conclusion. *See,*

*e.g., Lowrey v. Circuit City Stores, Inc.*, 158 F.3d 742, 760 (4th

Cir. 1998), *vac. on other grounds*, 527 U.S. 1031, 119 S.Ct. 2388

(1999); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 866-67 n.6 (7th

Cir. 1985) ("Plaintiffs' use of 'pattern-or-practice' language also

seems to be misplaced, since such suits, by their very nature,

involve claims of classwide discrimination, and the five

plaintiffs, while attacking policies that would have affected all

of Jewel's women employees as a class, have stated only their

individual claims, not a class action.") (citations omitted); *Axel*

*v. Apfel*, 2000 WL 1593446, *6 (D. Md. 2000); *Herendeen v. Mich.*

*State Police*, 39 F.Supp. 2d 899, 905 (W.D. Mich. 1999). Similarly,

while the Fifth Circuit has not definitively ruled out the use of

the *Teamsters* method of proof in a private, individual racial

discrimination suit, this Court's precedents seem to support such

an exclusion. *Scarlett*, 676 F.2d at 1053; *Mooney*, 54 F.3d at 1219-

20 (upholding lower court's rejection of "pattern or practice"

instruction because individual plaintiffs failed to show they were

entitled to such an instruction).

Given the nature and purpose of the pattern and practice method of proof, this Court's precedents, and the precedents of other circuits, the district court did not err in refusing to apply the *Teamsters* method of proof as an independent method of proof to the appellants' individual claims in lieu of the *McDonnell Douglas* method at the summary judgment stage.[4]

## B. The prima facie case and the showing of "better qualifications"

Appellants also contend that the district court misapplied *McDonnell Douglas* by requiring the appellants to show as part of their prima facie case that they were "better qualified" than the employees promoted or trained in their stead. Had the district court expanded the four-element prima facie case for racial discrimination through failure to promote or train this might be true. However, this is not what the district court did; the district court only asked for evidence that the plaintiff employee was "better qualified" than the employee given promotion or training in those instances where CITGO's proffered legitimate,

---

[4] This conclusion is based on precedent indicating that the *Teamsters* method is simply not available to plaintiffs that are not a part of a class action. *See* *Scarlett*, 676 F.2d at 1053 (indicating that to use this method the plaintiff must either be part of a class action or the suit must be instituted by the government under certain circumstances). As the plaintiffs are before us in their individual capacities, due to their failure to obtain class certification, the *Teamsters* method is not available to them. *Id.*

non-discriminatory reason for its employment decision was that the plaintiff employee was less qualified than the employee awarded the promotion or training. In other words, the district court's request for evidence that the plaintiff employee was "better qualified" did not occur at the prima facie case stage of the three-part *McDonnell Douglas* analysis, but rather at the third stage, where the plaintiff is required to present evidence rebutting the defendant's proffered non-discriminatory explanation for its decision. Here, many of the appellants successfully made out their prima facie cases of racial discrimination, CITGO put forward that its decision not to promote or train these appellants was based on the superior qualifications of the other employee, and the appellants were left to rebut this proffered non-discriminatory reason. To succeed in doing so, the appellants were obliged to bring forward enough evidence on summary judgment so as to create a genuine issue of material fact on whether or not CITGO's explanation was pretextual. The district court ruled that the appellants failed to meet their burden under this third prong of the *McDonnell Douglas* framework by failing to introduce competent summary judgment evidence that CITGO's explanation was false or pretextual (i.e. evidence that the appellant was "better qualified").

This Court has ruled that a plaintiff may survive summary judgment and take his case to the jury by providing evidence that

22

he was "clearly better qualified" than the employee selected for the position at issue. *Scott*, 148 F.3d at 508; *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 123 (5th Cir. 1992). The single question for the trier of fact is whether the employer's selection of a particular applicant over the plaintiff was motivated by discrimination, and evidence of the plaintiff's superior qualification is thus probative of pretext. *Deines v. Dept. of Prot. & Regulatory Servs.*, 164 F.3d 277, 281 (5th Cir. 1999). However, the bar is set high for this kind of evidence because differences in qualifications are generally not probative evidence of discrimination unless those disparities are "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Deines*, 164 F.3d at 280-81.

A review of the briefs and record excerpts reveals that none of the appellants presented competent summary judgment evidence that they were "clearly better qualified" for promotion or training. They therefore failed to even attempt to rebut CITGO's proffered non-discriminatory explanation, making the grant of summary judgment to CITGO proper.

**The affidavit of  Dr. Andrew Hacker**

The appellants also appeal the district court's refusal to consider on summary judgment the affidavit of Professor Andrew

23

Hacker, the appellants' expert on racial harassment. The district court struck this affidavit because (1) it did not contain relevant factual information regarding the actual work environment at CITGO, (2) it was not based upon personal knowledge as required by Fed. R. Civ. P. 56(e), and (3) it contained many inflammatory accusations leveled at CITGO and all of Calcasieu Parish in general without any specific reference whatsoever to the source of such a verbal attack. Dr. Hacker admits that his affidavit does not include data showing a hostile work environment at CITGO, but nevertheless the affidavit concludes that racial harassment in Lake Charles is likely "the product of a culture of segregation, isolation and subordination pervasive in the area."

A district court has broad discretion to rule on the admissibility of expert's affidavits in the summary judgment context, and its ruling must be sustained unless manifestly erroneous. *Boyd v. State Farm Ins. Co.*, 158 F.3d 326, 331 (5th Cir. 1998). To be considered on summary judgment, an expert's affidavit must include materials upon which the expert based his opinion, as well as an indication of the reasoning process underlying the opinion. *Id.* Because Dr. Hacker's conclusory affidavit does not give such insight into his reasoning process, the district court was within its discretion to exclude it.

## CONCLUSION

Having carefully reviewed the record of this case and the

24

parties' respective briefing and for the reasons set forth above, we conclude that the district court did not err in granting summary judgment or in excluding Dr. Hacker's affidavit.  We, therefore, AFFIRM the district court's decision in its entirety.

**AFFIRMED.**