# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
August 9, 2013

Lyle W. Cayce
Clerk

No. 12-51123

CURTIS L. HINER,

Plaintiff–Appellant

v.

JOHN M. MCHUGH, Secretary of the Department of the Army,

Defendant–Appellee

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:11-CV-184

Before HIGGINBOTHAM, CLEMENT, and PRADO, Circuit Judges.

PER CURIAM:[*]

Curtis Hiner, an African-American civilian U.S. Army employee, brought a Title VII discrimination action against John McHugh, the Secretary of the Army ("the Army"), alleging that he was denied a promotion because he is black and that he had experienced a racially hostile workplace environment. The district court granted summary judgment in favor of the Army on all claims, and Hiner appealed. Because Hiner has failed to establish that the reasons given for his non-promotion were pretextual and because the circumstances he alleges do

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-51123

not rise to the level of a hostile work environment, we affirm the decisions of the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Hiner is a GS-13-equivalent civilian employee of the Department of the Army. Since 2006, he has held the position of Chief of the Administration, Logistics and Service Support Division in the Civil Support Training Activity ("CSTA") at Fort Sam Houston, Texas.[1] On January 15, 2009, Joseph Hunt, the director of CSTA, notified all eligible employees that a new Division Chief position would soon be opening and that any interested employee should submit a resume for consideration. Division Chiefs are GS-14 employees, and in this case, the Division Chief's job duties would include training and providing support to state National Guard Weapons of Mass Destruction, Chemical, Biological, Radiological/Nuclear, and Explosive ("CBRNE") Civil Support Response Teams.

Hunt's supervisor had authorized Hunt to execute "management-directed reassignments," of which the filling of the Division Chief position was one. Management-directed reassignments are "noncompetitive," which meant that Hunt was authorized to select a candidate unilaterally. However, in an apparent abundance of caution, Hunt convened a three-person selection panel, similar to those used in "competitive" actions, to fill the position. The panel Hunt chose consisted of three white males: William Sherman, William Havlic, and Hunt himself. The same three people had comprised the panel that in 2006 had selected Hiner for his current GS-13 position. Neither Sherman nor Havlic is in Hiner's chain of command. Jesus Daniel Ramirez, Hiner's direct supervisor, assembled the submitted resumes but did not serve on the panel or otherwise evaluate candidates.

---

[1] CSTA provides training, evaluation oversight, and support for various National Guard groups and other teams who respond to mass disasters.

No. 12-51123

Five candidates submitted resumes and were reviewed for the position: Hiner, John Branum, Ed Hrna, James Barkley, and Mark Welch. Hiner, Barkley, and Welch are black; Branum and Hrna are white. Each panel member independently ranked each of the five candidates on a five-point scale in seven categories, for a total of 105 possible points per candidate. After the panel members' scores for each of the candidates had been added together, the results were as follows:

| | |
|---|---|
| Branum | 96 |
| Barkley | 91 |
| Welch | 80 |
| Hrna | 76 |
| Hiner | 57.5 |

The panel members were unanimous in their ranking of Branum as the best-qualified, apparently based on Branum's CBRNE, operations, and leadership experience, as well as his time as a Marine Corps Officer. The panel was also unanimous in its choice of Barkley as the second-best-qualified candidate. On January 22, 2009, Hunt submitted his recommendation that Branum be offered the position. When the Civilian Personnel Advisory Center ("CPAC") received the recommendation, it notified Hunt that anyone being promoted to a GS-14 position was required to have at least a year's experience in a GS-13 position. CPAC apparently notified Hunt because the version of Branum's resume that CPAC accessed was outdated and did not indicate that he had fulfilled that requirement. There is some confusion as to what then took place, but it appears Branum subsequently submitted his current resume—the same one he had submitted for review by the selection panel—that reflected his time as a Marine

3

No. 12-51123

Corps battalion commander, which CPAC viewed as sufficient to qualify him for the position. After Hiner indicated that he had concerns about the way the selection process had been conducted, Hunt's supervisor also independently reviewed and approved Hunt's recommendation that Branum be hired as Division Chief.

When another Division Chief position opened in mid-February, rather than conduct a new candidate search, Hunt used the same panel rankings to select someone for the position. Barkley, who had been unanimously ranked second and therefore as the first alternate, was chosen for the second Division Chief position. Barkley and Branum were both assigned to their new Division Chief positions on March 29, 2009.

During several conversations that took place after the selection had been made, Ramirez allegedly told Hiner, "Joe [Hunt] doesn't like your black ass. He's going to fire your black ass." Hunt apparently never used that language himself.

On April 23, 2009, Hiner filed an Equal Employment Opportunity Commission ("EEOC") complaint alleging he had been passed over for the Division Chief position because of his race.[2] After he filed his complaint, there occurred a number of events that ultimately led Hiner to amend his complaint to include the additional claim that he had been subjected to a hostile work environment.

First, on May 14, Hiner received a fax indicating that two CSTA employees had been exposed to radiation. While Hunt and Ramirez were discussing the

---

[2] Hiner's complaint initially indicated that Hiner was also complaining of discrimination on the basis of his sex, but the claim was later withdrawn.

matter, Hiner received a second fax about the incident. When Hiner went to discuss the fax with Hunt, Hunt allegedly snatched the fax from Hiner and said, "Well, let me read the damn thing." Hunt later apologized to Hiner for swearing.

Second, in June 2009, Hiner experienced an increase in his workload related to intake and processing for newly hired CSTA personnel. Other CSTA employees also saw an increase in their work duties as a result of this organizational growth. Hiner complained to Ramirez about the amount of work he had, and eventually additional staff was hired to help Hiner with his duties.

Third, in late June 2009, Hiner requested temporary duty assignment ("TDY") so that he could assist another Division Chief on an upcoming trip to Puerto Rico. Initially, Ramirez gave Hiner permission to go, but he later asked Hiner why he was going on TDY when he was having difficulty fulfilling his existing work duties. Ultimately, Ramirez formally denied Hiner's TDY request after learning it would be less expensive to send someone from Atlanta to Puerto Rico than to send Hiner.

In July 2009, citing these three incidents, Hiner amended his EEOC complaint in order to make the additional claim that he had experienced a hostile work environment, which he alleged was inflicted both because of his race and in retaliation for his having filed an EEOC claim. On May 18, 2010, following an investigation and a fact-finding conference, the Administrative Judge assigned to Hiner's case found in favor of the Army. The Army adopted the Administrative Judge's decision as its Final Agency Decision, and the EEOC Office of Federal Operations affirmed that Final Agency Decision on December 1, 2010.

No. 12-51123

On March 4, 2011, Hiner sued the Army in the Western District of Texas for, *inter alia*, violations of Title VII.  In his complaint, he reiterated his claims that he was not offered the Division Chief position because of his race and that he was subjected to a hostile work environment from May 14 to June 29, 2009.  Hiner sought damages for backpay and mental anguish, employment in a GS-14 position, and attorney's fees.  The Army filed a motion for summary judgment on June 29, 2012, asking the court to dismiss all of Hiner's claims.

The district court granted the Army's summary judgment motion in full.  With respect to Hiner's non-selection claim, the court found that Hiner was unable to demonstrate that the Army's proffered reason for his non-promotion was pretextual.  With respect to Hiner's hostile work environment claim, the court found that none of the three specific incidents Hiner complained of were motivated by Hiner's race, and that neither those incidents nor Ramirez's admittedly inappropriate comments unreasonably interfered with his work performance.  Finally, the district court determined that Hiner's retaliation claim failed because he had not established a causal link between the three incidents complained of and the filing of the EEOC complaint.  Hiner timely appealed the district court's order.

## II. DISCUSSION

### A.     Standard of Review

"We review a grant of summary judgment *de novo*, viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." *Pierce v. Dep't of the U.S. Air Force*, 512 F.3d 184, 186 (5th Cir. 2007).  "[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

No. 12-51123

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted).

## B.     Hiner's Discrimination Claim

When, as here, there is no direct evidence of discrimination, an employee must meet his burden under the familiar *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009). First, the plaintiff must make out a prima facie case of racial discrimination. *McDonnell Douglas*, 411 U.S. at 802. To establish a prima facie case of racial discrimination in a non-promotion context, the plaintiff must demonstrate that (1) he is a member of a protected class, (2) he applied and was qualified for the position at issue, (3) he was not selected, and (4) the position was given to someone outside the protected class or the employer continued to seek applicants with the same qualifications as the plaintiff. *Id.*; *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 680–81 (5th Cir. 2001). "If established, a prima facie case raises an inference of discrimination, and the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse decision. If the defendant presents such a reason, . . . the plaintiff must offer evidence that the proffered reason is a pretext for racial discrimination." *Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 342 (5th Cir. 2002) (citations omitted).

The Army concedes that Hiner has made out a prima facie case of discrimination. In response, however, the Army presents a legitimate, nondiscriminatory reason for Hiner's non-promotion, namely that "the selection panel determined in good faith that [Hiner] was not as qualified as the selectee."

7

No. 12-51123

Therefore, the issue before this court is whether Hiner has offered sufficient evidence that the Army's articulated reason is mere pretext for racial discrimination.

In support of its proffered reason, the Army cites the fact that Branum was unanimously deemed the most qualified by the panel members, while Hiner was ranked the least qualified of all five candidates. The Army also emphasizes that Barkley, who is also black, was hired for the second Division Chief position using the same panel rankings. Hiner, meanwhile, offers essentially three arguments to show pretext. First, he argues that not only was he objectively more qualified than Branum, Branum did not even have the required qualifications for the job because he had not worked in a GS-13 position for at least one year. Second, he claims that Branum was "pre-selected" for the position, i.e., that Hunt planned to hire Branum before the panel reviewed the other four candidates' resumes. Third, he argues that the Army did not follow the normal process for reviewing application packets during the review process.

Hiner has not met his burden of demonstrating pretext in this case. Hiner is correct that, if he can show he was "clearly better qualified [than Branum] (as opposed to merely better or as qualified)," this would allow a factfinder to infer pretext. *EEOC v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1444 (5th Cir. 1995) (internal quotation marks omitted); *see also Deines v. Tex. Dep't of Protective & Regulatory Servs.*, 164 F.3d 277, 280–81 (5th Cir. 1999). However, the factual claims undergirding his argument that he was clearly more qualified than Branum have been thoroughly and convincingly rebutted by the Army. First, far from the evidence being "clear" that Branum was "unqualified for the position," the record indicates that Branum was widely considered the best candidate for

8

No. 12-51123

the job. CPAC's request that Branum submit an updated resume reflects only the fact that CPAC did not have Branum's current resume (the one submitted to the selection panel) in its centralized system and was therefore *unable to verify* that Branum possessed the required qualifications, not—as Hiner contends—that he was actually unqualified. When his resume was updated, CPAC quickly concluded that Branum's Marine Corps experience qualified him for the Division Chief position, a conclusion later affirmed by Hunt's supervisor. Additionally, in his deposition, Hiner indicated that he believed his resume and Branum's resume were comparable, and stated, "[Branum] is more experienced than I am in certain areas, I'm more experienced than he is in other areas." Later in the deposition he went so far as to say that if he were to "compare[] resumes, we stack up equal in most cases except for [Civilian Support Skills Course]," a course that Branum had taken but Hiner had not. We conclude that Hiner has not shown he was more qualified—or even as qualified—for the Division Chief position, much less that he was "clearly more qualified," as our precedent requires.

Nor can Hiner demonstrate pretext with his argument that Branum was "pre-selected,"a claim that the Army disputes, but that we assume is true for purposes of evaluating whether the district court should have granted summary judgment. *See Pierce*, 512 F.3d at 186. As Hiner concedes in his own briefing, "[p]re-selection, in and of itself, does not establish pretext unless the pre-selection was motivated by discriminatory animus." *Cf. Walsdorf v. Bd. of Comm'rs for the E. Jefferson Levee Dist.*, 857 F.2d 1047, 1051 (5th Cir. 1988) ("Plaintiff's analysis would have us ignore the evidence that [defendant] preselected [selectee] for the position in a process which, at least initially, may

not have been motivated in any way by his animus toward women in the workplace."); *Glass v. Lahood*, 786 F. Supp. 2d 189, 224 (D.D.C. 2011) ("[T]here is nothing per se improper about 'pre-selection,' at least from the standpoint of Title VII.  For evidence of preselection to be relevant, there must be indicia of discrimination attached to the preselection.").  Even if Hiner's allegation of pre-selection is true, there is no contention that racial animus was a reason for the pre-selection.  We therefore cannot find that this argument establishes pretext.

Finally, Hiner's claim that the Army violated its own hiring procedures is not accurate and would not establish pretext even if it were.  Hiner claims that the Army was required to follow "FSH Reg. 690-4" in hiring the new Division Chief, but that the selection process violated that regulation in a number of ways.  However, Branum was hired pursuant to a management-directed reassignment, a "noncompetitive action" to which FSH Reg. 690-4 does not apply.  But even if Hiner were correct that the Army had violated its own hiring regulations, the Army's "disregard of its own hiring system does not prove racial discrimination absent a showing that discrimination was a motive in the action taken."  *Sanchez v. Tex. Comm'n on Alcoholism*, 660 F.2d 658, 662 (5th Cir. 1981).  Not only was no such showing made, the very same process Hiner challenges led to the hiring of Barkley, another black male, for an identical Division Chief position.  For all these reasons, Hiner has failed to meet his burden under the *McDonnell Douglas* framework, and we conclude that the district court correctly dismissed his discrete discrimination claim.

## C.     Hiner's Hostile Work Environment Claim

To make out a successful hostile work environment claim, the plaintiff must show that (1) he is a member of a protected group; (2) he was a victim of

No. 12-51123

harassment; (3) the harassment was based on race; (4) the harassment affected a "term, condition or privilege" of his employment (i.e., the harassment was so pervasive or severe as to alter his conditions of employment and create an abusive working environment); and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *See Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012); *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002); *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 806 (5th Cir. 1996). Whether an environment is hostile or abusive depends on the totality of the circumstances, including the frequency and severity of the discriminatory conduct; whether it is physically threatening or humiliating, or "a mere offensive utterance"; and whether it unreasonably interferes with an employee's ability to perform his job. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

We affirm the district court's dismissal of Hiner's hostile work environment claims. Hiner never articulates any connection between his race and the three incidents he complains of: Hunt's harsh language when asking for the fax, Hiner's increased workload, or the denial of Hiner's TDY request. Regarding the swearing incident on May 14, Hiner admits that this behavior was not abnormal for Hunt and that Hunt treated all subordinates in a similar manner, regardless of race, an assessment corroborated by other CSTA employees. Because Hiner's increased workload was the result of the influx of newly hired CSTA employees, other employees were also given more work, again, regardless of race. Moreover, Hiner was eventually granted the additional staff he requested. The reasons Hiner's TDY request was denied were his heavy existing workload and the fact that it was less expensive to send an

11

No. 12-51123

employee from Atlanta instead. Indeed, Hiner's race was never mentioned in the course of any of the events he describes. Hiner simply provides no evidence that race was a factor in any of the three incidents that form the basis of his hostile work environment claim, and we therefore affirm the district court's decision.

In his EEOC complaint, Hiner did not raise the argument that Ramirez's remarks about Hunt not liking Hiner's "black ass" contributed to a hostile work environment, and his claim is therefore likely unexhausted. *See, e.g.*, *Fine v. GAF Chem. Corp.*, 995 F.2d 576, 577–78 (5th Cir. 1993) (holding that a plaintiff's administrative remedies were not exhausted with respect to an incident of sexual discrimination because the incident sued upon was separate from the one raised in her administrative charge). Even assuming *arguendo* that Hiner's claim was properly exhausted, however, his claim still fails. While the remarks were clearly "based on race," Hiner presents no evidence that they were "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Harris*, 510 U.S. at 21. Hiner neither makes any claim that Hunt himself ever made similar comments, such that racial animus could explain the three events Hiner elsewhere complains of, nor does Hiner point to any evidence that the comments themselves unreasonably interfered with his work performance. *Cf. Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 331 (5th Cir. 2009) ("These occasional [inappropriately sexual] statements did not create a hostile work environment because they were not severe, physically threatening, or humiliating . . . . This is not the kind of conduct that would interfere unreasonably with a reasonable person's work performance."). Because Hiner does not offer a single example of how a "term,

condition, or privilege" of his employment was affected by Ramirez's comments, we affirm the district court's disposition of this issue.[3]

## D.     Hiner's Retaliation Claim

Hiner argues that the three events that together constituted a hostile work environment occurred both because of his race *and* as retaliation for his filing an EEOC claim.  In order to make out a prima facie case of unlawful retaliation under Title VII, the plaintiff must show that he (1) engaged in protected activity, (2) an adverse employment action occurred, and (3) there is a causal link between the protected activity and the adverse employment action.  *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996).  As with a discrete discrimination claim, the employer may rebut the plaintiff's prima facie case by articulating a legitimate, nondiscriminatory reason for the adverse employment action.  *See id.* at 304–05.  The plaintiff then has the burden of demonstrating pretext.  *Id.*  Hiner has established the first element of his prima facie case.  However, even assuming the second two elements have been established (which is not at all clear), the Army has offered a legitimate, nondiscriminatory reason

---

[3] Hiner also makes much of the fact that during some period before 2008, Hunt displayed a portrait of Nathan Bedford Forrest, the first leader of the Ku Klux Klan, near his office.  After Hiner complained about the portrait to the CSTA's Deputy Chief of Staff, the portrait was removed.  Hiner did not raise the argument that the display of this portrait constituted a hostile work environment before the EEOC, but even if his claim had been properly exhausted, it would matter little because the parties do not dispute that the portrait was removed in 2006 or 2007.  In order for the "continuing violation doctrine" to apply—which it must for this claim to avoid being time-barred—Hiner would have to "show an organized scheme leading to and including a present violation, such that it is the cumulative effect of the discriminatory practice, rather than any discrete occurrence, that gives rise to the cause of action." *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 352 (5th Cir. 2001) (quoting *Huckabay v. Moore*, 142 F.3d 233, 239 (5th Cir.1998)).  The display of the portrait ended several years before the incidents forming the basis of Hiner's hostile work environment claim, and Hiner makes no argument that it was in any way related to those events, other than the conclusory assertion that they were all part of a hostile work environment.

No. 12-51123

for each of the three cited incidents, namely that Hunt's harsh language is typical of his management style, that many CSTA employees other than Hiner experienced increased workloads, and that it was cheaper to send someone from Atlanta to Puerto Rico than from San Antonio.  Hiner has not argued that any of these reasons is merely pretext for retaliation.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment.