Barbara **WEBSTER**, Plaintiff,

v.

**BASS ENTERPRISES PRODUCTION CO.**, Defendant.

No. Civ.A. 3:00–CV–2109M.

United States District Court,
N.D. Texas,
Dallas Division.

Feb. 13, 2002.

---

Mellannise Henderson-Love, Yolanda D. Montgomery, Henderson-Love Montgomery, Dallas, TX, for plaintiff.

Christopher Edward Howe, Marjorie G Panter, Kelly Hart & Hallman, Fort Worth, TX, for defendant.

Will Pryor, Will Pryor Mediation & Arbitration, Dallas, TX, pro se.

### MEMORANDUM OPINION AND ORDER

LYNN, District Judge.

Before the Court is Defendant's Motion for Summary Judgment, filed November 6, 2001. Defendant Bass Enterprises Production Co. ("Bass"), challenges the sufficiency of the evidence produced by Plaintiff Barbara Webster ("Webster") on her sexual harassment, age discrimination, retaliation, and intentional infliction of emotional distress claims. Specifically, Bass contends the evidence is that Webster was terminated because of her progressively worsening defiant and contentious behavior, not because of her sex, age, or protected activity, and that she was not subjected to a discriminatory or hostile working environment. Upon consideration, the Court **GRANTS** the Defendant's Motion in part, and **DENIES** it in part.

### FACTUAL SUMMARY [1]

Webster worked in Bass's accounting department from 1978 until her discharge in 1999, performing clerical and administrative duties. It is undisputed that she found it difficult to work with supervisors at Bass. Although the gravamen of Webster's discrimination allegations stem from the time beginning in 1998 when she was supervised by Bonnie Brown ("Brown") and Carl Ernst ("Ernst"), Webster admittedly had a less than amicable relationship with all of her supervisors.[2]

Bass claims Webster's history of unprofessional behavior toward her supervisors worsened in early 1999. As evidence of Webster's unsatisfactory conduct, Bass points to a computer password incident on February 10, 1999. Webster, who was

---

1. Except where otherwise stated, these are facts that the parties have agreed are correct or on which one has offered evidence undisputed by the other.

2. From the late 1980's until 1991, Webster was supervised by Gary McDaniel and Steve Tradenick. In her deposition, she admitted having problems getting along with both of them. From early 1991 until 1998, Webster reported to Curtis Callaway ("Callaway") and his supervisor, Ernst. Webster found it difficult to work with these supervisors. She testified that "[t]hey upset everything. Curtis and Carl. They worked to do that," and "[t]hey were calling a lot of shots without

knowing what went on in there. They had no idea of the frustration. I had it running and they upset it by making changes...." In 1993, Callaway and Ernst met with Robert Cotham ("Cotham"), the company's comptroller with sole authority to make discharge decisions, to recommend Webster's discharge. Cotham apparently rejected the recommendation because of Webster's long tenure with Bass, but agreed to remove her from her position as file room supervisor. A new administrative position was created for Webster to perform bank reconciliations and keep vendor master files current. In July, 1998, Brown replaced Callaway.

absent from work, is alleged to have defiantly refused to give Ernst her computer password so he could access a data file, and to have cooperated with him only after he threatened to obtain her password with the aid of the technical department. Bass also produced evidence that when Webster was denied vacation during busy times in the accounting department, she took sick days or behaved contentiously, remarking that she should have the right to take vacations whenever she wanted. Brown, and to a lesser degree, Webster, also testified about Webster's difficulties with filing procedures and bank reconciliations.

Webster claims she approached Brown on February 12, 1999, to discuss problems she was having with Ernst, including the February 10, 1999, computer password incident. Webster said she believed Ernst was retaliating against her because of a 1993 speaker phone incident.[3] She speculated that Ernst might manipulate confidential computer-stored information to somehow set her up. Allegedly based on the anger exhibited by Webster during this meeting, Brown decided to recommend to Cotham that Webster be discharged.

Webster also alleges that she met with Gary Reese, on February 18, 1999, and with Brown on February 22, 1999, concerning Ernst's alleged discriminatory treatment of her. Bass apparently disputes this point, but has not offered sworn testimony from Reese to rebut the allegation, and Brown does not mention in her affidavit whether there was a February 22, 1999 meeting.

On February 22, 1999, Brown and Ernst drafted a memorandum detailing Webster's conduct and performance problems, which they gave to Cotham the next day. He sent the memorandum to Keith Bullard ("Bullard"), Bass's personnel manager, who met with Webster on February 24, 1999. In the meeting, Webster complained that Ernst was sexually harassing her.

After an investigation, Bullard found Webster's allegations to be without merit, largely based on his conclusions regarding the 1993 speaker phone incident and Webster's alleged admission, to him, that Ernst had never propositioned or inappropriately touched her. Written findings were drafted and orally communicated to Webster on March 5, 1999. Webster responded that "[e]veryone [wa]s lying." Although she offered no proof of it, Webster then told Brown that Bullard had been previously accused of sexual harassment. On March 9, 1999, Ernst and Brown met with Webster to provide her a written job description, because she had complained she did not fully understand her duties.

Cotham met with Webster on April 1, 1999, after Webster again allegedly refused to e-mail Ernst or Brown her computer password before leaving for vacation. Ernst and Brown claim she verbally attacked them, contending that eight women had previously worked for Ernst and quit

---

**3.** Significant briefing details this incident between Webster, Callaway, and Ernst. Webster was apparently told by Callaway to hire Kirk Dimery, who had been working as a temporary employee, as a permanent employee for the file room. Webster disapproved of the selection because she said Dimery had inappropriately touched her on several occasions. A few days later, Ernst and Callaway called her on the speaker phone to ask how "her temporary" was doing, and then allegedly referred to that person as "the one that cannot keep his hands off you." Webster claims she reported this incident to Gary Reese ("Reese"), a Bass manager. In conjunction with an internal investigation of Webster's harassment complaints in 1999, Reese stated he recalled nothing about any 1993 incident involving Ernst and Webster, or any other allegation made to him about Ernst harassing Webster.

because of him. Again she offered no proof to support her allegations. Cotham informed Webster that she would be discharged if she refused to perform her duties or continued to be argumentative or confrontational, and he warned her to cease repeating false allegations about Ernst.[4]

On April 8, 1999, Webster filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Bass was served with the charge on April 15, 1999.

On April 12, 1999, Brown again complained to Cotham about Webster's confrontational attitude. On April 14, 1999, Cotham issued a "Final Warning" to Webster, stating her behavior toward Brown "constitute[d] insubordination, disrespect and resistance to supervision," and that if she "engage[d] in any subsequent act of misconduct or any type of unacceptable performance, [her] employment [would] be terminated immediately."

On June 4, 1999, Brown issued another memorandum to Cotham concerning Webster's continuing poor performance and inappropriate conduct. Brown described incidents in which Webster resisted supervisory authority during May and June. Upon consideration of the memorandum, on June 7, 1999, Cotham discharged Webster.

4. At this meeting, Webster asked Cotham to talk to her co-worker, Stephanie Allen, to corroborate her harassment allegations. Cotham claims he did so and that Allen told him that Ernst was a "wonderful man and manager," and that Webster made it known that she "hated men."

5. *Kerr v. Lyford*, 171 F.3d 330, 336 (5th Cir. 1999).

6. *Kee v. City of Rowlett, Tex.*, 247 F.3d 206, 210 (5th Cir.), *cert. denied*, —— U.S. ——, 122 S.Ct. 210, 151 L.Ed.2d 149 (2001).

## STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that, as a matter of law, the movant (Bass) is entitled to judgment.[5] The non-moving party, (Webster) must make a positive showing that a genuine dispute of material fact exists.[6] The record before the Court will be considered in the light most favorable to Webster, as non-movant.[7]

## ANALYSIS

Webster complains that Bass subjected her to sexual harassment,[8] age discrimination, retaliation, and intentional infliction of emotional distress. The sufficiency of a plaintiff's evidence "must be made on a case-by-case basis, depending on the nature, extent, and quality of the evidence."[9] Looking to the circumstances in total, the Court concludes that no fact issue exists which should forestall summary disposition of Webster's several harassment, age discrimination, or IIED claims, but that a fact issue exists as to Webster's retaliatory discharge claim.

### A. Sexual Harassment

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to

7. *Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir.2001).

8. The Court notes that the parties use sex "discrimination" and "harassment" interchangeably in both the Complaint and briefing, even though they apply specific hostile work environment and *quid pro quo* tests rather than the general *McDonnell Douglas* framework.

9. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902–03 (5th Cir.2000).

his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." [10] Here, Webster claims Bass, through Ernst, subjected her to a hostile or abusive work environment. She also claims Ernst inflicted *quid pro quo* harassment on her.[11]

▮ To prove a prima facie case of discrimination arising from an allegedly hostile work environment in violation of Title VII, Webster must demonstrate that she was a member of a protected class (female); she was subjected to unwelcome sexual harassment; the harassment complained of was based upon sex or gender; and the harassment was sufficiently severe or pervasive to affect a "term, condition, or privilege" of employment.[12] To be "severe and pervasive," the workplace must be

"permeated with 'discriminatory intimidation, ridicule, and insult.' " [13] Supreme Court and Fifth Circuit precedent impose a heavy burden of production on a plaintiff to show that sexual harassment is severe and pervasive.[14] "Courts determine whether an environment is sufficiently abusive to be actionable under Title VII by reviewing all of the relevant circumstances, including the frequency of the conduct, its severity, whether it is physically threatening ... humiliating ... mere[ly] offensive ... and whether it unreasonably interferes with the employee's work performance." [15]

Mere conclusory or self-contradictory allegations will not protect an otherwise unsupportable claim from summary disposition.[16] Webster's allegations are burdened by conclusory and contradictory asser-

---

**10.** 42 U.S.C. § 2000e–2(a)(1).

**11.** Courts continue to categorize sexual harassment as alleging *quid pro quo* or hostile work environment, although the importance of these labels was lessened as a result of the analysis in *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). *Ellerth* presented a traditional *quid pro quo* scenario, where a supervisor threatened employment retaliation unless the subordinate performed sexual favors. *Faragher* presents a traditional hostile work environment claim where several supervisors made crude, offensive, and insensitive comments, creating a hostile work environment. The Court noted the continued use of the labels of *quid pro quo* and hostile work environment harassment had taken on a significance exceeding their utility.

**12.** *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 70–71, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343 (5th Cir.2001). In the wake of *Ellerth* and *Faragher*, the traditional five-factor test, with the fifth factor requiring that the employer knew or should have known of the harassment and failed to take remedial action, was modified in cases alleging that a supervisor with immediate (or successively

higher) authority over the employee harassed the employee. In that instance, only the first four elements of the test need be satisfied. Once the employee makes this showing, an "employer is subject to vicarious liability to a victimized employee," unless the employer can establish the affirmative defense to liability set forth in *Ellerth*. *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257.

**13.** *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Savings Bank, FSB*, 477 U.S. at 65, 106 S.Ct. 2399).

**14.** *Taylor v. United Regional Health Care Sys.*, No. 7:00–145, 2001 WL 1012803, *6 (N.D.Tex. Aug. 14, 2001).

**15.** *Pfeil v. Intecom Telecommunications*, 90 F.Supp.2d 742, 749 (N.D.Tex.2000).

**16.** *Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 324 (5th Cir.1998) (summary dismissal will not be avoided by mere unsupported allegations of fact or unsupported factual and legal conclusions); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.) (mere conclusory statement in affidavits are not admissible), *cert. denied*, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

tions.[17] Her sole support for a large number of claims is her own affidavit. The portions of her affidavit that contradict, without explanation, her prior unchanged deposition testimony will not be considered by the Court.[18] When the conclusory and contradictory portions of her affidavit are ignored, as they must be, the objectively mild nature of Webster's hostile work environment claim is revealed.

Webster alleges the following facts give rise to her sexual harassment claim: Ernst yelled at her; once threw his pen down on her desk during an exchange; shook papers in her face; on two or three occasions, came up behind her chair and pushed her into the desk when reviewing her computer screen; yelled at his wife and kids on the phone; once asked her what type of men she liked; on two or three occasions, stated that they should go get drunk; on a few occasions, had "dancing" eyebrows and stuck his tongue out; "invad[ed] her workspace" by keeping in-baskets, note-pads, and supplies at her desk; denied her raises, sick time, and vacation requests; called her at home when she was sick to yell at her for not giving him her personal password; and stated that all single women were fair game.[19] Webster also claims that, sometime in the early eighties, she was made to overhear Ernst talking about looking up women's dresses, and that a friend of Ernst made a sexually explicit comment to Ernst when Webster was, unbeknownst to the speaker, also on the telephone. Bass contends these alleged incidents are innocuous, time-barred, and do not rise to the level necessary to sustain a hostile work environment claim.

Webster met annually with Cotham, never asserting that she was harassed. She claims she confided in Reese, sometime during February 1999, concerning the alleged harassment by Ernst. Bass did not provide affidavit or sworn testimony from Reese but argues that Reese, during the internal investigation by Bullard, recalled only that Webster "griped" generally about Ernst and could not remember any complaints concerning sexual harassment. Although Webster now contends that Ernst began harassing her in 1993 or 1995, she testified in her deposition that she definitively realized she was being harassed by Ernst in the 1980s.[20] Webster's lack of clarity and consistency as to when her environment became hostile and "unworkable" underscores the "workable" nature of her environment.[21]

■ Title VII does not protect female employees from an uncomfortable environ-

17. *See Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir.2000) ("If a party who has been examined at length in deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."), *cert. denied*, 531 U.S. 1073, 121 S.Ct. 766, 148 L.Ed.2d 667 (2001).

18. Bass moves to strike Webster's affidavit as conclusory and inadmissible hearsay. Mere conclusory allegations, without support, or where contradicted by former deposition testimony, will not create a genuine fact issue to support summary judgment. *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir. 1984). An example of an unsupported conclusion is Webster's contention that Ernst ha-

rassed her by leaving an off-color cartoon in her desk, although she later admitted she had no idea how the cartoon got there and admitted not being offended by it. To the extent the affidavit contradicts her prior sworn testimony, with no explanation for the contradiction, it will not be considered.

19. *See* Pl.'s Resp. at 10–11; Pl.'s App. at 56–58.

20. *Compare* Pl.'s Resp. at 26–27 *with* Def's App. at 190–193.

21. *See, e.g., Celestine v. Petroleos de Venezuela SA*, 266 F.3d 343, 352 (5th Cir.2001) (upholding summary judgment on a hostile work environment claim where black employees at a petroleum plant failed to establish the existence of intentional, pervasive, and regular

ment that is made so by factors unrelated to gender.[22] Mere abusive conduct or language does not violate Title VII,[23] nor do "complaints of ... gender-related jokes, and occasional teasing" rise to the level of discriminatory conduct.[24] Here, even if true, the alleged harassment is not "sufficiently severe or pervasive [so as] to alter the conditions of employment and create an abusive working environment."[25] Indeed, most of Webster's criticisms, e.g., that Ernst occasionally yelled at his wife and kids, shook papers, denied Webster vacation and sick leave, and used a loud voice, have nothing to do with gender. Those few that arguably do relate to gender are relatively few in number, were made sparingly over a ten-year period, were not physically threatening, and were not shown to undermine Webster's performance. Simply put, the allegations are "too tepid" to be actionable.[26] As a matter of law, they are not severe and pervasive.

Cases based on threats of adverse employment action or promises of favorable employment action for sexual favors are *quid pro quo* cases, as distinct from "bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment."[27] While Webster admitted to Bullard in February 1999, that Ernst did not proposition her, she claims she discussed with Brown, on March 18, 1999, what she referred to as a veiled sexual proposition of her by Ernst. Webster claims she told Brown that sometime during a 1997 discussion about a raise she asked Ernst what she needed to do to get a better raise, and he replied, "[i]t depends on what you're willing to do." Webster replied that she could earn a better raise if he would give her more responsibility and allow her to do more work.

Even if the Court were to interpret Ernst's comment on a raise in 1997 as a veiled *quid pro quo* suggestion, the comment is time-barred. It clearly falls outside of the 300–day limitations period for bringing EEOC charges.[28]

racial discrimination); *Southard v. Texas Bd. of Crim. Justice,* 114 F.3d 539, 555 (5th Cir. 1997) (holding that an official who stared at the female plaintiff, made suggestive comments to her, and slammed her door, was entitled to qualified immunity because his conduct was not severe or pervasive enough to constitute sexual harassment); *Long v. Eastfield College,* 88 F.3d 300, 309 (5th Cir. 1996) (single offensive joke did not support a claim for hostile work environment); *DeAngelis v. El Paso Mun. Police Officers Assoc.,* 51 F.3d 591, 595–96 (5th Cir.1995) (holding ten columns in association newsletter containing derogatory statements about women, four of which referred to plaintiff, could not alone constitute actionable sexual harassment).

**22.** *Oncale v. Sundowner Offshore Serv., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

**23.** *Caro v. City of Dallas,* 17 F.Supp.2d 618, 628 (N.D.Tex.1998).

**24.** *Faragher v. City of Boca Raton,* 524 U.S. 775, 778, 118 S.Ct. 2275, 141 L.Ed.2d 662

(1998) (quoting B. LINDEMANN AND D. KADUE, SEXUAL HARASSMENT IN EMPLOYMENT LAW, 175 (1992)).

**25.** *Meritor Savings Bank, F.S.B. v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

**26.** *Shepherd v. Comptroller of Public Accounts,* 168 F.3d 871, 873 (5th Cir.), *cert. denied,* 528 U.S. 963, 120 S.Ct. 395, 145 L.Ed.2d 308 (1999).

**27.** *Ellerth,* 524 U.S. at 751, 118 S.Ct. 2257.

**28.** *Webb v. Cardiothoracic Surgery Assoc. of North Tex., P.A.,* 139 F.3d 532, 537 (5th Cir. 1998). Even if the Court were to disregard the untimeliness of Webster's claim, the allegations would not establish a prima facie case of *quid pro quo* harassment. As described by *Ellerth,* a *quid pro quo* claim arises "[w]hen a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands." *Id.* at 754, 118 S.Ct. 2257. Webster would have to argue

Webster's sexual harassment claims are not actionable. The Fifth Circuit has consistently held that an employee's subjective belief of discrimination alone is not sufficient to warrant relief.[29] Because the Court finds Webster's sexual harassment claims insufficient to survive summary judgment, it does not reach Bass's alternative argument, that it can establish the *Ellerth* affirmative defense to liability.[30]

## B. Age Discrimination in Employment Act

◼ Under the Age Discrimination in Employment Act ("ADEA"), it is "unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." [31] ADEA cases employ the *McDonnell Douglas* burden shifting framework.[32] Thus, Webster must first establish a prima facie

case of discrimination. To do this, she must prove that: (1) she was a member of a protected class—those persons over the age of forty; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was either replaced by someone outside of the protected class, replaced by someone younger, or otherwise discharged because of her age.[33] When an employee establishes a prima facie case of age discrimination, the employer must identify, through the introduction of admissible evidence, a legitimate non-discriminatory reason for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination did not cause the employment action. Only a minimal showing is necessary to meet the burden of establishing a prima facie case of age discrimination, but "some evidence" that the employment decision was motivated by unlawful discrimination is necessary for Webster's age discrimination claim to survive summary judgment.[34]

that she was discharged two years after the alleged threat because she refused to perform whatever sexual favor Ernst was proposing in 1997. That scenario is simply too remote to be actionable. Further, Webster has not pleaded or proven that she was denied a raise because she refused to submit to Ernst's "proposition." Webster has not shown that Ernst conditioned any tangible employment benefits on her submission to his alleged sexual demands.

**29.** *See, e.g., Bauer v. Albemarle Corp.,* 169 F.3d 962, 968 (5th Cir.1999); *E.E.O.C. v. Louisiana Office of Community Services,* 47 F.3d 1438, 1443–44 (5th Cir.1995).

**30.** *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

**31.** 29 U.S.C. § 623(a)(1).

**32.** *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**33.** *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Bauer,* 169 F.3d at 968.

**34.** *Id.* at 967 (quoting *Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 41 (5th Cir.1996)). *See also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory"); *Vadie v. Mississippi St. Univ.,* 218 F.3d 365, 374 n. 23 (5th Cir.2000) ("a jury issue will be presented and a plaintiff can avoid summary judgment ... if the evidence taken as a whole ... creates a reasonable inference that age was a determinative factor in the actions of which plaintiff complains"); *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 224 (5th Cir.2000); *Ross v. Univ. of Texas,* 139 F.3d 521, 525 (5th Cir. 1998); *Gray v. Sears, Roebuck & Co., Inc.,* 131 F.Supp.2d 895, 903 (S.D.Tex.2001).

Here, Webster alleges that she was reassigned to different tasks, denied computer training classes, and replaced by someone younger because of her age—52. Webster can establish her prima facie case. However, Bass has proffered a non-discriminatory justification for terminating her—her allegedly persistent defiant and confrontational attitude, and there is "abundant and uncontroverted independent evidence that no [age] discrimination [ ] occurred." [35]

■■■■■ Bass contends that Brown's refusal to let Webster attend a particular PowerPoint class and its assignment to her of different tasks are not adverse employment actions, especially given that younger employees were similarly treated. This Court agrees.[36] As to the termination, which is clearly an "adverse employment decision," Webster has not presented any evidence that Bass's explanation as to its decision to terminate her was a pretext for age discrimination.[37] Even assuming Webster can and would provide evidence that Bass's justification for discharging her

was false, summary judgment is appropriate because, as stated by the Supreme Court in *Reeves*, evidence of pretext may, but will not always sustain a finding of unlawful discrimination.[38] Here, nothing in the record supports a finding of age discrimination. Simply, Webster has not produced sufficient evidence for a reasonable jury to conclude that her termination was based on age discrimination. In the absence of any admissible evidence of age discrimination, defendant is entitled to summary judgment as a matter of law.[39] Webster has not "create[d] a reasonable inference that age was a determinative factor in the actions of which [she] complains."[40] The Fifth Circuit has consistently held that an employee's subjective belief of discrimination is insufficient to warrant relief.[41]

### C. Retaliation

■■■■■ Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice" by the statute.[42] To suc-

---

**35.** *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 468–69 (5th Cir.2002) (affirming a judgment as a matter of law ruling in a race discrimination case because "taken as a whole," there was no evidence of racial discrimination) (quoting *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097).

**36.** *Burger v. Central Apartment Mgmt., Inc.*, 168 F.3d 875, 877 (5th Cir.1999) ("Our court has analyzed the 'adverse employment action' element in a stricter sense than some other circuits."); *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir.) (ultimate employment decisions, which Title VII was designed to address, include acts "such as hiring, granting leave, discharging, promoting, and compensating"), *cert. denied*, 522 U.S. 932, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997).

**37.** *Rubinstein v. Adm'rs of Tulane Educational Fund*, 218 F.3d 392, 400–01 (5th Cir.2000), *cert. denied*, 532 U.S. 937, 121 S.Ct. 1393, 149 L.Ed.2d 316 (2001). *See also Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 402 (5th

Cir.2001). Webster claims that a February 22, 1999, memorandum from Ernst and Brown to Cotham demonstrates the falsity of Bass's non-discriminatory justification. In it, Ernst and Brown propose several solutions to Webster's performance problems. The first is an offer to Webster of early retirement. As a matter of law, the consideration of that alternative does not constitute evidence of age discrimination.

**38.** *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097.

**39.** *Vance v. Union Planters Corp.*, 209 F.3d 438, 444 (5th Cir.2000); *Lawrence v. Univ. of Tex.*, 163 F.3d 309, 313 (5th Cir.1999).

**40.** *Vadie*, 218 F.3d at 374 n. 23.

**41.** *See, e.g., Bauer*, 169 F.3d at 968; *E.E.O.C. v. Louisiana Office of Community Services*, 47 F.3d 1438, 1443–44 (5th Cir.1995).

**42.** 42 U.S.C. § 2000e–3(a).

ceed on a retaliation claim, the plaintiff must establish that: (1) the employee engaged in activity protected by Title VII; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action.[43] Once a prima facie case is established, the burden of producing some non-discriminatory reason for its actions falls upon the defendant.[44] The ultimate question in an unlawful retaliation case, however, is whether the defendant discriminated against the plaintiff because she engaged in conduct protected by Title VII.[45]

Bass asserts that Webster's informal complaints are unprotected "oppositional conduct" and that the alleged causal connection between Webster's EEOC charge and her discharge is legally untenable.

### (1) Protected Activity

Although the parties contest the timing and parameters of the protected activity, it is undisputed that Webster engaged in protected conduct. She filed a charge of discrimination with the EEOC on April 8, 1999. Bass does not dispute that the filing of a charge of discrimination is protected activity. However, Bass contends that Webster's informal complaints, on February 18, 22, and 24, 1999,[46] to Reese, Brown, and Bullard respectively, were "oppositional" conduct not protected by Title VII.[47]

In order to establish a prima facie case of retaliation, an employee does not have to prove the validity of the grievance he or she was allegedly punished for lodging.[48] Some of Webster's accusations toward Bullard and Ernst, that Bullard had been previously accused of sexual harassment and that eight women had previously quit because of Ernst, were unsupported and, according to Bass's proof, unsupportable. However, simply because a plaintiff's complaint does not rise to that level necessary to support a sexual harassment claim, or even because it is based on wholly incorrect facts, does not mean he or she was not engaging in protected conduct when he or she made the complaint. A mistaken but good faith belief that Title VII has been violated is protected.[49] The Court cannot say at this stage that Webster's complaints, internally and with the EEOC, were raised in bad faith.[50] Fact

**43.** *Mattern,* 104 F.3d at 705.

**44.** *E.E.O.C. v. J.M. Huber Corp.,* 927 F.2d 1322, 1326 (5th Cir.1991) (citation omitted).

**45.** *Long v. Eastfield College,* 88 F.3d 300, 304 n. 4 (5th Cir.1996).

**46.** In her sworn affidavit, Webster also alleges that on February 18 and 22, 1999, she confided in Reese and Brown, respectively, that Ernst was harassing her. Bass contends this is contradicted by her deposition testimony, in which she could not recall complaining to anyone in February about discrimination (including harassment). Bass further notes Brown's affidavit and Reese's recollection during his internal interview with Bullard that Webster never complained to them of Ernst sexually harassing her. However, Bass did not provide an affidavit from Reese. Its rebuttal of Webster's assertion that she engaged in protected conduct beginning on February 18, 1999 is hearsay from Bullard's internal investigation. Her affidavit, viewed as

it must be at this stage of the litigation in the light most favorable to Webster, could be said to supplement rather than supplant her deposition testimony. *See Bazan v. Hidalgo Cty.,* 246 F.3d 481, 486 (5th Cir.2001); *S.W.S. Erectors, Inc. v. Infax, Inc.,* 72 F.3d 489, 494 (5th Cir.1996). It thus must be considered and creates a factual dispute between Webster and Brown.

**47.** *Wilson v. U.T. Health Ctr.,* 973 F.2d 1263, 1268 (5th Cir.1992), *cert. denied,* 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993).

**48.** *Id.*

**49.** *Robbins v. Jefferson Cty. Sch. Dist.,* 186 F.3d 1253, 1259 (10th Cir.1999).

**50.** *Wilson,* 973 F.2d at 1267 (district court finding sexual harassment reports were misrepresentations lodged in bad faith).

issues remain as to whether Webster engaged in protected conduct beginning on February 18, 1999.

## (2) Adverse Employment Action

■ The Fifth Circuit has adopted a restrictive definition of "adverse employment action," to include such actions as hiring, firing, demotion, denial of promotion, leave, and adverse pay decisions.[51] In this instance, the only action constituting an adverse employment action is Webster's discharge.[52] A few week temporary assignment in the file room or new cubicle is not an actionable adverse employment action.[53]

## (3) Causal Connection

Bass asserts that there is no causal connection between Webster's filing of an EEOC charge and her subsequent termination. Webster's discharge came sixty days after she filed a charge with the EEOC and over ninety days after she

allegedly complained to Brown, Reese, and Bullard. She points to her "flawless" record before her complaints as evidence of a causal connection supporting a finding of retaliatory discrimination. Her depiction of her history with Bass is inaccurate. Callaway and Ernst recommended to Cotham that Webster be discharged in 1993.[54] Ernst also filed a "Special Review" of Webster in 1994.[55]

■ In *Watts v. Kroger Co.*,[56] the Fifth Circuit upheld the district court's summary dismissal of the plaintiff's retaliation claim where the causation element was not satisfied. There, adverse action was initiated two days before the plaintiff complained, thus breaking the causal chain. Here, by the time Bass was served with Webster's charge of discrimination, it had already issued a Final Warning to her, denied her a pay increase, and repeatedly reprimanded her for defiant behavior. Thus, before receiving notice of her EEOC charge, Bass had initiated a progressive

---

51. *Mattern,* 104 F.3d at 707 (stating that Title VII was only designed to address "ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions").

52. Although Webster mentions it only in a passing sentence, to the extent her retaliation claim rests on allegedly being denied a pay raise on April 9, 1999, this does qualify as an adverse employment decision. *Mattern,* 104 F.3d at 707 (adverse pay decisions).

53. *See Burger v. Central Apartment Mgmt., Inc.,* 168 F.3d 875, 878 (5th Cir.1999) (discussing the roots of "adverse employment action"). *See also Thomas v. Texas Dept. of Criminal Justice,* 220 F.3d 389, 393 (5th Cir. 2000) (formal discipline, an unfavorable assignment, and an assignment to unkempt living quarters did not constitute an ultimate employment action); *Watts v. Kroger Co.,* 170 F.3d 505, 511 (5th Cir.1999) (neither a change in schedule nor an assignment of new tasks constitutes an ultimate employment action).

54. In September 1993, Callaway and Ernst drafted a memorandum, outlining problems in the file room under Webster's control. The memorandum itemized difficulties Webster allegedly had with superiors and peers because of her "failure to adapt to change," inability "to distinguish between petty personnel problems and significant ones," "confrontation[al] [attitude] with [supervisors,]" and inability "to receive criticism positively."

55. The "Special Review" of Webster concerned Webster's alleged refusal to follow Ernst's instructions regarding the mailing of certain letters. Webster went above Ernst to have another manager consider the propriety of her mailing the letters, and then, after the other manager refused to pass on the propriety, she did not mail them. Ernst alleges he discovered the letters were not mailed only when he happened to check the status of the project. Webster refused to sign the special review.

56. 170 F.3d 505, 511 (5th Cir.1999).

discipline process relating to Webster's inappropriate behavior.[57] Significantly, however, it is these disciplinary actions and the gap between them and Webster's informal complaints that raises a fact issue regarding retaliation. Indeed, despite Webster's admittedly problematic past with Bass, it was not until shortly after she allegedly complained of harassment that the disciplinary action intensified to the ultimate level.

If, as she claims, Webster complained to Reese on February 18, 1999, Brown on February 22, 1999, and Bullard on February 24, 1999, questions remain as to whether Bass's progressive discipline began as a result of her engaging in protected conduct. A more than four-year gap exists between a supervisor's last written disciplinary review against Webster and Brown and Ernst's disciplinary memorandum of February 22, 1999. This chasm, coupled with the more frequent and progressively more severe criticism of Webster following her complaints, creates a fact question on causation which precludes summary dismissal of Webster's retaliatory discharge claim. Webster may prove that "but for" her complaints, she may not have been terminated.

### D. Intentional Infliction of Emotional Distress Claim

■ To prevail on an intentional infliction of emotional distress ("IIED") claim, Webster must show that: (1) Bass acted intentionally or recklessly; (2) its conduct

was extreme and outrageous; and (3) its actions caused Webster to suffer severe emotional distress.[58] "The facts of a given claim of outrageous conduct must be analyzed in context." [59] The Court agrees with Webster that repeated or ongoing harassment of an employee, if the cumulative quality and quantity of the harassment is extreme and outrageous, may give rise to IIED liability.[60] However, taken in context, the actions of Ernst and Brown cannot support an IIED claim.

■ Extreme and outrageous conduct is that which is so extreme in degree, and so outrageous in character, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.[61] Here, the alleged conduct, though perhaps tasteless or rude, falls short of meeting the extremely high standard for an intentional infliction claim.[62] Webster's allegations in support of her IIED claim—that Ernst threw objects at her, raised his eyebrows and stuck his tongue out in a sexually suggestive manner, asked her if she wanted to get drunk, yelled at her in front of co-workers, told her that all single women were fair game, denied her raises, and pushed her and her chair into the desk while he reviewed her computer screen from behind her—do not describe conduct so "vile or reprehensible" as to be intolerable in a civilized society. Webster's IIED claim must be summarily dismissed.[63]

---

**57.** *Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 62, 151 L.Ed.2d 29 (2001).

**58.** *See Skidmore v. Precision Printing and Packaging,* 188 F.3d 606, 613 (5th Cir.1999).

**59.** *GTE Southwest, Inc., v. Bruce,* 998 S.W.2d 605, 615 (Tex.1999); *Wilson v. Monarch Paper Co.,* 939 F.2d 1138, 1143 (5th Cir.1991).

**60.** *Id.*

**61.** *Wornick Co. v. Casas,* 856 S.W.2d 732, 734 (Tex.1993).

**62.** *See Prunty v. Arkansas Freightways, Inc.,* 16 F.3d 649, 654 (5th Cir.1994) (an employer's disturbing conduct will not constitute "extreme and outrageous" conduct, "except in the most unusual cases").

**63.** *Gearhart v. Eye Care Ctrs. of Am., Inc.,* 888 F.Supp. 814, 823 (S.D.Tex.1995).

## CONCLUSION

As a matter of law, Plaintiff does not raise genuine issues of material fact of discrimination on her sexual harassment, age discrimination, and intentional infliction of emotional distress claims. The Court therefore **GRANTS** Defendant's Motion for Summary Judgment as to these claims. However, the Court finds material issues of fact which preclude summary judgment on Plaintiff's retaliation claim and therefore **DENIES** Defendant's Motion as to that claim.

**SO ORDERED.**